

# ORIGINAL

Michael T. Mervis (MM 0306)
Jenifer deWolf Paine (JP 9393)
PROSKAUER ROSE LLP
11 Times Square
New York NY 10036
Tel.: 212.969.3000
Fax: 212.969.2900
E-mail: mmervis@proskauer.com
          jpaine@proskauer.com

*Attorneys for Plaintiff*



**12 CV 3990**

**DOC #:** _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID ROSENGARTEN<br><br>      Plaintiff,<br><br>v.<br><br>STANLEY B. WOLFSON, and<br>U.S. WINE ASSOCIATION, INC.<br><br>      Defendants. | Civil Action No.:<br><br>FILED<br>U.S. DISTRICT COURT<br>12 MAY 18 PM 2:40<br>S.D. OF N.Y. |

## COMPLAINT AND JURY DEMAND

Plaintiff David Rosengarten ("Plaintiff" or "Rosengarten"), by his attorneys, for his complaint against Defendants Stanley B. Wolfson ("Wolfson") and U.S. Wine Association, Inc. ("U.S. Wine" and, collectively with Wolfson, the "Defendants") hereby alleges as follows:

### Nature of the Claims

1.  This is an action for willful trademark infringement, unfair competition, and false designation of origin under 15 U.S.C. § 1125(a); cybersquatting under 15 U.S.C. § 1125(d); violation of the Right of Publicity under NY Civil Rights Stat. §§ 50 and 51; and for deceptive acts and practices, misappropriation, and conversion under state and common law.

1

2.  Rosengarten is, as more fully detailed below, a renowned food and wine critic, author, chef and television personality who is famous for his meticulous and painstaking research.  He has a vast and loyal following that has grown to trust him for his honest and informative reviews of restaurants, wines and other culinary matters.  Defendants have, through their unlawful actions described herein, severely damaged Rosengarten's reputation and caused him grave and continuing professional and economic injury.  Specifically, Defendants have, without Rosengarten's authority, used Rosengarten's name, the trademark ROSENGARTEN REPORT, and the domain names rosengartenreport.com, therosengartenreport.com, and davidrosengarten.com (collectively, the "Domain Names") to promote Defendants' business activities (including selling wine and "subscriptions" to a newsletter that is not actually distributed by Defendants and has not been published for over 20 months, and to falsely suggest a business association between Defendants and Rosengarten.  In addition, Wolfson has a significant amount of  Rosengarten's personal property, including invaluable research files, in his possession and has refused to turn that property over to Rosengarten.

### Parties and Jurisdiction

3.  Plaintiff Rosengarten is a New York resident residing in New York County.

4.  On information and belief, Defendant Wolfson is an individual New York resident with an address of 2016 Adam Clayton Powell Jr. Blvd, New York, NY 10027.

5.  On information and belief, Defendant U.S. Wine is a Delaware corporation with an address of 257 W. 117th St., New York, NY 10026, and a registered address of 1220 N. Market Street, Suite 808, Wilmington DE 19801.

6.  On information and belief, Defendant Wolfson and his wife, Dori Ann Hanswirth, are the sole principals and stockholders of U.S. Wine.

7.  This Court has subject matter jurisdiction because: (a) this is a civil action arising under the Trademark Laws of the United States, Sections 43(a) and (d) of the Lanham Act, 15 U.S.C. §§ 1125(a) and 1125(c), jurisdiction being conferred in accordance with 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a); and (b) this Court has supplemental jurisdiction of Plaintiff's state and common law claims pursuant to 28 U.S.C. §§ 1367(a) and 1338(b).

8.  This Court has personal jurisdiction over Defendants because Defendants reside in this judicial district.  In addition, Defendants have committed tortious acts within the State of New York and within this judicial district.

9.  Venue is proper in this District under 28 U.S.C. § 1391(b).

## Facts Common to All Counts
### Rosengarten

10.  Rosengarten is a chef, author and television personality in the field of food and wine. He has hosted over 2500 television program episodes for The Food Network and is extremely well-known within food and wine circles.

11.  Rosengarten was a contributing editor to and New York restaurant critic for *Gourmet Magazine* from 1995 – 1999.  Before that, he was Contributing Food Editor and restaurant critic for *Departures* (American Express' deluxe magazine for Platinum Card holders).  He was the weekly wine columnist for *Newsday* from approximately 1989 - 1993.  He has published articles on food, wine and travel in *The New York Times, The New York Daily News, The New York Observer, Food & Wine* (for which Rosengarten wrote a regular column), *The Wine Spectator* (where Rosengarten was an editor and columnist from approximately 1983 - 1989), *Bon Appetit,*

*Harper's Bazaar, House Beautiful, Business Week, Metropolitan Home, Expedia Travels, Cigar Afficionado, The San Jose Mercury News,* and other widely-read publications. He is currently the Wine Editor of *Saveur* magazine, a regular contributor to *Wine & Spirits* magazine, and a regular contributor to *The Huffington Post.*

12. Rosengarten has written five major cookbooks: *Red Wine With Fish: The New Art of Matching Wine With Food* (Simon & Schuster); *The Dean & Deluca Cookbook* (Random House); *Taste* (Random House), based on his television show, which won the IACP/Julia Child Cookbook Award for Best International Cookbook in 1999 and the Versailles Award in France for "Best Cookbook Based On A TV Show"; *It's ALL American Food* (Little Brown), which won the 2004 James Beard Award for "Best Cookbook on the Cooking of the Americas"; and *David Rosengarten Entertains* (Wiley).

13. Beginning in 2001, Rosengarten started publishing a subscription-only newsletter called *The Rosengarten Report.*

14. The Rosengarten Report ultimately had over 50,000 paid subscribers. In 2003, *The Rosengarten Report* won the 2003 James Beard Award as America's Best Food and Wine Newsletter.

15. Because of Rosengarten's renown in the world of food and wine, both (i) DAVID ROSENGARTEN and (ii) ROSENGARTEN REPORT have come to be associated by the relevant consuming public as identifying products and services originating with Rosengarten, and Rosengarten has developed strong and valuable trademark rights in both DAVID ROSENGARTEN and ROSENGARTEN REPORT.

### The ROSENGARTEN REPORT And The Domain Names

16.  At its inception in 2001, *The Rosengarten Report* was published by Rosengarten. Shortly thereafter, also in 2001, Rosengarten transferred the publishing rights to *The Rosengarten Report* to a company called Minds on Fire, LLC, of which Rosengarten along with two other individuals were the sole members.

17.  In 2002, Minds of Fire sold the rights to *The Rosengarten Report* to a company in Virginia called KCI, which in turn formed a company called Salt Pig Publishing LLC to own and run *The Rosengarten Report*.

18.  While Salt Pig was publishing *The Rosengarten Report*, it paid Rosengarten approximately $18,000 a month to write, edit, and produce the publication.

19.  On or about November 26, 2008, Salt Pig sold all pre-existing content and materials relating to *The Rosengarten Report* to an entity called Fresh Pressed Olive Oil, LLC ("Fresh Pressed").  Fresh Pressed later transferred all rights to back issues of *The Rosengarten Report* back to Rosengarten.  Salt Pig retained ownership over the domain names therosengartenreport.com, rosengartenreport.com, the trademarks associated with *The Rosengarten Report*, and the current subscriber list for *The Rosengarten Report*.

20.  On or about November 26, 2008, Salt Pig agreed to redirect the domain name davidrosengarten.com to a new page as directed by Fresh Pressed for three months, and after that time to transfer and assign the domain name to Rosengarten.

21.  Pursuant to those obligations, on August 13, 2009, Salt Pig's successor transferred the domain names rosengartenreport.com and davidrosengarten.com (but, due to inadvertence, not therosengartenreport.com) to the control of Watson Blair, an information technology specialist who was at that time working for Rosengarten.

### History of the Parties' Relationship

22. In or about August of 2009, Rosengarten met Wolfson and, in or about September of 2009, agreed to start working with him. There were two main ventures in which Rosengarten and Wolfson were working on together: *The Rosengarten Report* and the business of U.S. Wine.

23. Wolfson explained to Rosengarten that U.S. Wine was to be a wine "club" that people would join and be able to buy, at "rock bottom" prices, a case or more of various wine selections. U.S. Wine would "facilitate" these purchases between the consumers and the wine producers, and make its money solely from membership fees.

24. U.S. Wine never became fully operative during the time that Rosengarten and Wolfson worked together.

25. On information and belief, U.S. Wine started selling "memberships" in or about December 1, 2010 (after Rosengarten and Defendants had parted ways) and taking orders for wine. On information and belief, none of those orders were ever filled.

26. The exact nature of the relationship between Rosengarten and Defendants was never formalized. At various times Wolfson referred to Rosengarten as his "partner", although he at one point presented Rosengarten with a proposed "Employment Agreement" by which Rosengarten would be employed by U.S. Wine. Rosengarten did not sign the flawed "Employment Agreement" proposed by Wolfson. During the parties' entire relationship, Wolfson never paid Rosengarten a salary or any other fees for his services.

27. Rosengarten did not sign any agreement with Defendants giving Defendants rights to the trademark rights in THE ROSENGARTEN REPORT, the name and trademark DAVID ROSENGARTEN or the Domain Names.

28. In June of 2010, Rosengarten and Wolfson resumed publication of *The Rosengarten Report,* which had not been in a few years.  Rosengarten wrote and edited the publication and Wolfson provided back-up support services including IT (information technology) services, office space, and a web master to handle interactions with subscribers.  In this fashion, they produced five issues of *The Rosengarten Report.*

29. The re-launch of *The Rosengarten Report* was written up in *The New York Times* in June of 2010.  The article stated "David Rosengarten has started publishing his highly-detailed, thoroughly researched food newsletter again . . . ."

30. Unbeknownst to Rosengarten at the time, Wolfson and/or U.S. Wine somehow acquired control of the Domain Names without Rosengarten's consent.

31. Regardless of exactly how Defendants obtained control of the Domain Names, they are now all controlled by U.S. Wine, with Wolfson's personal e-mail address listed as the "contact."

32. In September of 2010, the relationship between Rosengarten and Wolfson soured, and Wolfson told Rosengarten that he no longer wanted to do business with him, that he was "fired", and that he was no longer welcome at U.S. Wine's offices.  The result was that the approximately 1,500 subscribers to the *Rosengarten Report* – who had paid $59.95 for twelve issues and thus far had received only five – were left without any further issues, with no communication, and no refund.

33. At that time, Rosengarten's personal files (reflecting approximately 30 years' worth of research and notes), along with 40 cases of wine, were in the basement of U.S. Wine's office.  Despite repeated requests by Rosengarten and his counsel for Defendants to return these materials to Rosengarten, Defendants have failed and refused to do so and remain in unlawful possession of these materials to this very day.

7

34. Wolfson then began a campaign of personal harassment against Rosengarten.

35. For example, Wolfson demanded that Rosengarten immediately move out of the apartment in which he was temporarily living that was owned by Wolfson (or one of his entities). Although Rosengarten explained to Wolfson that he needed some time to find a new apartment, Wolfson changed the locks on the apartment and Rosengarten had to have the doorman let him in with a master key. Rosengarten also had call the police to prevent Wolfson from coming to the apartment to harass him,

36. For another example, in October of 2010, Wolfson had Rosengarten arrested under false pretenses. In July of 2010, Wolfson allowed Rosengarten to use Wolfson's credit card to reserve a hotel room in Ohio. When Wolfson discovered that the hotel had charged Wolfson's card for the amount of the room rather than simply use it to hold the reservation, he spoke with Rosengarten and they agreed that Rosengarten would pay Wolfson back. Three months later, when Wolfson was in the midst of waging his campaign of harassment against Rosengarten, he had Rosengarten arrested for "identity theft" arising out of the hotel charge on the credit card. The criminal charges were eventually dismissed, but Rosengarten spent the day of the arrest in jail and missed an important meeting.

37. On information and belief, Wolfson arranged for an outrageously defamatory and personally humiliating "press release" to be issued regarding the arrest. The press release, dated November 15, 2010, is entitled "Cookbook Author David Rosengarten Is A Crook." The subtitle reads: "Well known cookbook author pleads guilty to fraud and larceny in New York criminal court."

38. The press release goes on to make the following false statements: "David Rosengarten plead guilty to credit card fraud in New York criminal court." In truth,. Rosengarten did <u>not</u> plead guilty. "There is a possibility of Federal Wire Fraud charges also

being sought against Rosengarten."  In truth, no such charges were ever brought nor, on information and belief, were such charges ever contemplated.  "Rosengarten appeared in Court looking dissheveled [sic] like a homeless person.  Rosengarten was asked why he committed this fraud.  His answer:  I didn't do it.  Why, then did you plead guilty?  I don't want to talk to you anymore."  In truth, this entire exchange never took place and, again, Rosengarten did <u>not</u> plead guilty.

39.  On information and belief, the entire purpose of this fictional press release, which was released on a web site called PR LOG that exists to distribute press releases, was to further harass Rosengarten and tarnish his reputation.  Indeed, the press release can be found today through a simple Internet search of Rosengarten's name.

### Defendants' Wrongful Acts
### I –The ROSENGARTEN REPORT

40.  Since the parties' relationship ended, Defendants have made on-going, unauthorized uses of the Domain Names, Rosengarten's name and likeness, and the ROSENGARTEN REPORT trademark, all to Rosengarten's detriment.

41.  U.S. Wine is, wrongfully and without Rosengarten's authorization, the record owner of <u>rosengartenreport.com</u> and <u>therosengartenreport.com</u>.

42.  Beginning at an unknown date and continuing through approximately September 8, 2011, each of <u>rosengartenreport.com</u> and <u>therosengartenreport.com</u> maintained a Web page that showed a photograph of Rosengarten with a "headline" that read "THE ROSENGARTEN REPORT IS BACK AT LAST . . . AND WE ARE EXCITED!!!" and then contained a link that read "subscribe below." The page contained other content that purported to be written by Rosengarten.  A printout of this page is attached hereto at <u>Exhibit A</u>.

43. In early September of 2011, after receiving a letter from Rosengarten's counsel, Defendants modified the web page to remove the photograph of Rosengarten, but all other content on the web page remained the same (until January of 2012, as described below).

44. This use of rosengartenreport.com and therosengartenreport.com gave consumers the false impression that these pages were authorized by and under the control of Rosengarten.

45. In addition, Defendants accepted credit card payments for subscriptions through these pages, even though *The Rosengarten Report* had ceased publication and Defendants were not filling such subscriptions.

46. As a result of consumers submitting credit card information and being charged $59.95 for a subscription to *The Rosengarten Report* that never arrived, Rosengarten received complaints from consumers who were able to find his e-mail address or other contact information.

47. In addition, Internet chat boards devoted to food and wine contained postings complaining about such unfilled subscriptions, further damaging the reputation of the ROSENGARTEN REPORT trademark and Rosengarten personally.

48. In apparent response to further correspondence from Rosengarten's counsel in January 2012, Defendants: (1) changed the web sites under rosengartenreport.com and therosengartenreport.com to contain a message stating that "We regret to inform you that the Rosengarten Report will be suspending publication due to the departure of David Rosengarten. As a result we ask for your patience as we begin implementing a transition" (a printout of this page is attached hereto as Exhibit B); and (2) sent an e-mail to the subscriber list of *The Rosengarten Report* that contained the identical message.  This message was the first communication the approximately 1,500 paid subscribers received since Wolfson "fired"

Rosengarten and ceased publication of *The Rosengarten Report* without issuing any refunds.  It

came 16 months after the last issue of *The Rosengarten Report*.

49.  This message -- as contained in the e-mail and on the web sites -- created the false

impression that *The Rosengarten Report* is an on-going concern without the participation of

Rosengarten and that Rosengarten was responsible for previous subscriptions not being

fulfilled.

50.  On information and belief, Defendants and/or their agents have falsely told people

who have called and inquired about *The Rosengarten Report* that Rosengarten had "sold" *The

Rosengarten Report* to them.

<u>Defendants' Wrongful Acts</u>
<u>II – Use of Rosengarten's Name</u>

51.  U.S. Wine is, wrongfully and without Rosengarten's authorization, the record owner

of <u>davidrosengarten.com</u>.

52.  Beginning at an unknown date and continuing through the present, Defendants are

maintaining a web page at <u>davidrosengarten.com</u> that offers for sale a wine (2002 Veleta

Tempranillo) and states that this wine has been "Given the David Rosengarten Official 'Seal of

Approval.'"   A printout of this page is attached hereto as <u>Exhibit C</u>.

53.  There is, however, no "David Rosengarten Official Seal of Approval", and

Rosengarten never gave Defendants (or anyone else) permission to use his name to sell this

wine though this web site.

54.  This page bears a copyright notice that reads "Copyright © 2012 The Rosengarten

Report <u>www.rosengartenreport.com</u>" – thus further creating the impression that Rosengarten

and *The Rosengarten Report* are selling this wine.

55. On information and belief, on at least one occasion after the parties were no longer in business with each other Defendants used the subscriber e-mail list for *The Rosengarten Report* to send out an "invitation" to all subscribers to purchase a membership with U.S. Wine.

56. This e-mail "invitation" created the false impression that Rosengarten supported or endorsed U.S. Wine.

57. On information and belief, Defendants and/or their agents have falsely told people who have called and inquired about the ROSENGARTEN REPORT that Mr. Rosengarten had "sold" the ROSENGARTEN REPORT to them.  In one such phone call, Wolfson's agents falsely told a subscriber that Rosengarten does not write *The Rosengarten Report*, and suggested that Rosengarten did not care about *The Rosengarten Report* by stating "you know how these celebrities are."

58. On information and belief, Defendants and/or their agents have used Rosengarten's name to obtain, under false pretenses, samples from food and wine vendors.

### The Effects of Defendants' Unlawful Activities

59. Defendants' unauthorized and misleading use of the Domain Names, the ROSENGARTEN REPORT trademark, and Rosengarten's name and likeness are unauthorized, infringing, and likely to confuse consumers.

60. The actual and clearly intended effect of Defendants' use of the Domain Names, the ROSENGARTEN REPORT trademark, and Rosengarten's name and likeness was and is to trade upon Rosengarten's existing goodwill and consumer recognition in those designations.

61. As a direct and proximate result of Defendants' actions, Rosengarten has suffered irreparable injury for which there is no adequate remedy at law and, absent injunctive relief,

Rosengarten will continue to suffer irreparable injury for which there is no adequate remedy at law.

62. On information and belief, Defendants have derived certain direct and indirect benefits and profits from their unlawful use of the Domain Names, the ROSENGARTEN REPORT trademark, and Rosengarten's name and likeness, all to Rosengarten's economic detriment and reputational expense.

63. Defendants' foregoing actions have caused Rosengarten to suffer damages, including but not limited to loss of goodwill.

64. On information and belief, Defendants' acts have been willful, wanton, intentional, and purposeful, or in reckless disregard of, or with callous indifference to, Rosengarten's rights.

65. Defendants' unauthorized and unlawful solicitations, sale of subscriptions to a non-existent publication, and sale of wine under the Domain Names, the ROSENGARTEN REPORT mark, and Rosengarten's name and likeness has resulted in unlawful profits to Defendants and has caused Defendants to be unjustly enriched.

66. Rosengarten's counsel has attempted to communicate with Wolfson, and then his counsel, several times to try to resolve these matters.  Although Wolfson and his counsel have suggested that Wolfson has the right to own the Domain Names and use the ROSENGARTEN REPORT trademark, they have repeatedly failed to produce any documentation supporting that position, leaving Rosengarten no choice but to file this action.

**COUNT I**
**Federal Trademark Infringement and Unfair Competition**

67. Rosengarten realleges the allegations of Paragraphs 1 through 66 of this Complaint as though fully set forth herein.

68. Defendants' use of the mark ROSENGARTEN REPORT and DAVID ROSENGARTEN in connection with the unauthorized sale and offer for sale of wine and a (non-existent) newsletter is likely to cause confusion, mistake, or deception as to the source or affiliation of Defendants' products. Specifically, Defendants' use is likely to cause purchasers or others to mistakenly believe that Defendants' products and services originate from or are legitimately connected with, sponsored by, or approved by Rosengarten.

69. Defendants' use of the mark ROSENGARTEN REPORT and DAVID ROSENGARTEN violates Rosengarten's exclusive rights in those designations and constitutes trademark infringement and unfair competition in violation of 15 U.S.C. § 1125(c), and the common laws of various states, including New York.

70. Defendants' use of ROSENGARTEN REPORT and DAVID ROSENGARTEN is greatly and irreparably damaging to Rosengarten and will continue to greatly and irreparably damage Rosengarten unless restrained by this Court. As a result, Rosengarten is without an adequate remedy at law.

71. Defendants' acts have been willful, wanton, intentional, purposeful and in deliberate disregard of Rosengarten's rights, entitling  Rosengarten to immediate and permanent injunctive relief, damages, Defendants' profits, punitive damages, reasonable attorney's fees and costs.

72. Defendants' foregoing actions have caused Rosengarten damages in an amount yet to be determined.

## COUNT II
## Cybersquatting

73. Rosengarten realleges the allegations of Paragraphs 1 through 66 of this Complaint as though fully set forth herein.

74. DAVID ROSENGARTEN is Rosengarten's personal name, and ROSENGARTEN REPORT is a distinctive trademark owned by Rosengarten.

75. By wrongfully registering and using the Domain Names in the unauthorized manner described above, Defendants have, with a bad faith intent to profit, registered and used domain names that are identical to and confusingly similar to the ROSENGARTEN REPORT trademark and the DAVID ROSENGARTEN name and mark.

76. Defendants' actions constitute cybersquatting in violation of 115 U.S.C. § 1125(d).

77. Defendants' registration and use of the Domain Names is greatly and irreparably damaging to Rosengarten and will continue to greatly and irreparably damage Rosengarten unless this Court orders the transfer of the Domain Names to Rosengarten. As a result, Rosengarten is without an adequate remedy at law.

78. Defendants' acts have been willful, wanton, intentional, purposeful and in deliberate disregard of Rosengarten's rights, entitling Rosengarten to immediate and permanent injunctive relief, damages, Defendants' profits, punitive damages, reasonable attorney's fees, and costs.

## COUNT III
### (Deceptive Acts and Practices In Violation of N.Y. Gen. Bus. Law § 349 and similar laws in other states)

79. Rosengarten realleges the allegations of Paragraphs 1 through 66 of this Complaint as though fully set forth herein.

80. The foregoing acts of Defendants constitute deceptive acts and practices in the conduct of a business, trade, and commerce in violation of (a) New York General Business Law § 349, and (b) similar statutory and common laws of each and every state in which Defendants advertised or promoted any products or services utilizing the ROSENGARTEN REPORT mark or the DAVID ROSENGARTEN name and mark.

81. Defendants' acts have been willful, wanton, intentional, purposeful and in deliberate disregard of Rosengarten's rights, entitling Rosengarten to immediate and permanent injunctive relief, damages, Defendants' profits, punitive damages, reasonable attorney's fees and costs. Defendants' acts have proximately caused great and irreparable damage to Rosengarten and will continue to greatly and irreparably damage Rosengarten unless restrained by this Court. As a result, Rosengarten is without an adequate remedy at law.

## COUNT IV
### (State and Common Law Trademark Infringement)

82. Rosengarten realleges the allegations of Paragraphs 1 through 66 of this Complaint as though fully set forth herein.

83.     The foregoing acts of Defendants constitute state and common law trademark infringement in violation of the state and common law of the State of New York and each and every other state in which Defendants have advertised or promoted any products or services utilizing the ROSENGARTEN REPORT mark or the DAVID ROSENGARTEN name and mark and that recognize state and/or common law trademark infringement claims.

84. Defendants' acts have been willful, wanton, intentional, purposeful and in deliberate disregard of Rosengarten's rights, entitling Rosengarten to immediate and permanent injunctive relief, damages, Defendants' profits, punitive damages, reasonable attorney's fees and costs. Defendants' acts have proximately caused great and irreparable damage to Rosengarten and will continue to greatly and irreparably damage Rosengarten unless restrained by this Court. As a result, Rosengarten is without an adequate remedy at law.

## COUNT V
### (State and Common Law Unfair Competition/Misappropriation)

85. Rosengarten realleges the allegations of Paragraphs 1 through 66 of this Complaint as though fully set forth herein.

86. The foregoing acts of Defendants constitute unfair competition and misappropriation in violation of the state and common law of the State of New York and each and every other state in which Defendants have advertised or promoted any products or services utilizing the ROSENGARTEN REPORT mark or the DAVID ROSENGARTEN name and mark and that recognize state and/or common law claims for unfair competition and/or misappropriation.

87.     Defendants' acts have been willful, wanton, intentional, purposeful and in deliberate disregard of Rosengarten's rights, entitling Rosengarten to immediate and permanent injunctive relief, damages, Defendants' profits, punitive damages, reasonable attorney's fees and costs.

88.     Defendants' acts have proximately caused great and irreparable damage to Rosengarten and will continue to greatly and irreparably damage Rosengarten unless restrained by this Court.  As a result, Rosengarten is without an adequate remedy at law.

## COUNT VI
### (Violation of Right of Publicity)

89. Rosengarten realleges the allegations of Paragraphs 1 through 66 of this Complaint as though fully set forth herein.

90. Defendants' acts as described above constitute unauthorized uses of Rosengarten's name and likeness for purposes of advertising and trade in violation of N.Y. Civ. Rights.  Law Art. 50 and 51.

91.     Defendants' acts have been willful, wanton, intentional, purposeful and in deliberate disregard of Rosengarten's rights, entitling Rosengarten to immediate and permanent injunctive relief, damages, Defendants' profits, punitive damages, reasonable attorney's fees and costs.

92. Defendants' acts have proximately caused great and irreparable damage to Rosengarten and will continue to greatly and irreparably damage Rosengarten unless restrained by this Court.  As a result, Rosengarten is without an adequate remedy at law.

## COUNT VII
## (Conversion Under New York Law)

93. Rosengarten realleges the allegations of Paragraphs 1 through 66 of this Complaint as though fully set forth herein.

94. Rosengarten has legal ownership of his files and certain wine that were stored in the basement of U.S. Wine's office.

95. Despite repeated requests to return these items or allow Rosengarten to claim them, Defendants have failed and refused to deliver them to Rosengarten or permit Rosengarten to retrieve them.

96.     Defendants have exercised unauthorized dominion over these items, to the exclusion of Rosengarten's rights.

97.     Defendants' acts have been willful, wanton, intentional, purposeful and in deliberate disregard of Rosengarten's rights, entitling Rosengarten to immediate and permanent injunctive relief, damages, punitive damages, reasonable attorney's fees and costs.

**Prayer for Relief**

WHEREFORE, Rosengarten respectfully prays for a Judgment to be entered against Defendants as follows:

A.     Preliminarily and permanently restraining and enjoining Defendants, their respective officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice thereof, jointly and severally from:

i.     using the marks ROSENGARTEN REPORT, DAVID ROSENGARTEN, or any mark confusingly similar thereto, on or in connection with any products or services;

ii.     using Rosengarten's name, portrait, picture, or voice for purposes of advertising or trade;

iii.     representing by any means whatsoever, directly or indirectly, that any products sold or services rendered by Defendants are associated with, sponsored by, or connected or affiliated with Rosengarten, or from otherwise taking any action likely to cause confusion, mistake, or deception on the part of the relevant public as to the origin or sponsorship of Defendants' products or services or as to the origin or sponsorship of Rosengarten's products or services;

iv.     otherwise competing unfairly with Rosengarten in any manner;

v.     using any words, names, styles, designs, titles or marks that create a likelihood of injury to the business reputation of Rosengarten;

vi.     registering any domain names that are confusingly similar to ROSENGARTEN REPORT or DAVID ROSENGARTEN;

vii.     continuing to perform in any manner whatsoever any of the acts complained of in this Complaint;

viii.     causing, engaging in, or permitting others to do any of the aforesaid acts.

B.     Requiring Defendants and/or the registrars of the Domain Names to immediately transfer the Domain Names to Rosengarten or his designee;

C.      Directing Defendants to deliver up to this Court by a date that the Court will direct, for impounding, destruction, or other disposition, all materials bearing the ROSENGARTEN REPORT mark or the name DAVID ROSENGARTEN or any marks confusingly similar thereto in the Defendants' possession, custody or control that violate the provisions of Paragraph A above, or any portion thereof.

D.      Directing Defendants to file with the Court and serve on counsel for Rosengarten within thirty (30) days after entry of any preliminary or permanent injunction issued by the Court in this action, a sworn written statement as provided in 15 U.S.C. § 1116 setting forth in detail the manner and form in which Defendants have complied with the injunction.

E.      Directing Defendants to account to Rosengarten for all gains, profits, and advantages derived from Defendants' wrongful acts above described.

F.      Directing that Defendants pay Rosengarten such damages as he has sustained as a consequence of Defendants' wrongful acts complained of herein and further directing that the aforesaid amounts be multiplied or otherwise enhanced as authorized by law.

G.      Directing Defendants to engage in appropriate corrective advertising.

I.      Awarding Rosengarten on his state law claims compensatory damages in an amount to be determined at trial.

J.      Awarding Rosengarten punitive and/or exemplary damages in such amount as may be determined at trial.

K.      Finding this to be an "exceptional case," because of the willful nature of the violations complained of herein, and directing that Defendants pay Rosengarten the costs of this action and his reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

L.      Directing Defendants to deliver to Rosengarten the files and wine in the possession of Defendants.

M.      Granting Rosengarten such other and further relief as the Court may deem just and proper.

Plaintiff demands a jury on all issues so triable.

PROSKAUER ROSE LLP

Dated:  May 18, 2012

Michael T. Mervis (MM 0306)
Jenifer deWolf Paine (JP 9393)
Eleven Times Square
New York, NY 10036
Tel: 212.969.3000
Fax: 212.969.2900
E-mail: mmervis@proskauer.com
        jpaine@proskauer.com

Attorneys for Plaintiff David Rosengarten

Ex. A



# Rosengarten Report

Home Submit

## THE ROSENGARTEN REPORT

## IS BACK AT LAST.....

## AND WE ARE EXCITED !!!

### (subscribe below!)

Though my food-and-wine career has involved thousands and thousands of exciting projects in many media forms...for me, one journalistic accomplishment stands out from the pack: the establishment of *The Rosengarten Report* in 2001.

It quickly won the James Beard Award as best food-and-wine newsletter in America, then zoomed to the top of the charts with 50,000 paid subscribers.

One taster (me!).....one writer (me!).....and 50,000 people to inform. Phew! I loved it!

In 2008 I initiated a general business re-organization, which resulted in a two-year hiatus for the newsletter while I sought to improve its every aspect.

Accompany David on his daily culinary adventures:



Feast on Facebook



Taste on Twitter

## Help us keep in contact with you!

Name:

Email:

See What David Stirs Up!



Online Payments

That period is over....and now, as of May, 2010.....*The Rosengarten Report* is back....ready for your enjoyment.....and it's better than ever!

The newsletter has always been my way of bringing you all the gastronomic details of my life: the products tasted, the wines tasted, the gastronomic trips taken, the world-wide restaurants and hotels, the recipes developed in my kitchen, my commentary on global food-and-wine trends--everything given to you in a zestily written, highly opinionated, information-crammed nine-times-a-year newsletter.

The new *Rosengarten Report* will come to you even more often--monthly!--as a beautifully designed e-mail magazine, which you will be able to enjoy on-line, or print out and hold. And...subscribers will automatically become members of **Rosengarten's Table**, which will enable them to get deep discounts, free offers, improved services from many of the people behind my recommendations (e.g. an extra course at a restaurant; an extra night at a hotel; free wine and food samples, etc.)

Here are some of the great stories *The Rosengarten Report* brought to its past readers:

☐ A Complete Guide to Mail-Order BBQ, with The Best of the Country in Every Category

6/3/2011

- ☐ The Japanese Ingredient Revolution in America: Understanding the Delicious Puzzle of the Japanese Pantry
- ☐ Brunch! Ten Categories of "Bests" to Help You Create a Stellar Sunday Party
- ☐ The El Bulli Chronicles....Beat-by-Beat Through 35 Courses.....and Your Best Strategies for Getting Reservations

And here are some of the stories I'm working on for the new **Rosengarten Report**:

- ☐ The Growing Phenomenon of Fresh-Pressed Olive Oil: Why It's Much Better When It's Young, and Where to Find the Very Best New Oils of Harvest 2009
- ☐ The Best Value in Europe for Summer 2010: Portugal! A Complete Travel Guide to the Country (restaurants, specialties, hotels, wines), plus a Tasting of the Best Portuguese Products in the U.S.
- ☐ You and a $7 Pork Shoulder: Brilliant Money-Saving Recipes and Manipulations (including everything from a Cuban Roast Pork Dinner, to Making Your Own Fried Pork Rinds from the same hunk)
- ☐ For Summer: The One Baltimore Crab House You Need to Know....and What Phone Call You Need to Make in Order to Get the Best Crabs!

☐Paella: The FULL, UNTOLD Story,
   reported from Valencia, with Great
   New Authentic Recipes
☐The 4000-word Primer that Will
   Simplify German Riesling Forever!
☐A Complete Guide to Peking
   Duck....in Peking! (Er...Beijing!)

(I'm also off to Crete this summer, the
French wine trail, Texas Hill Country,
Taiwan, and the chocolate plantations of
Venezuela.....)

**Subscribe to the Rosengarten Report
Now!**
**$59.95 for 1 Year - For 12 Issues**



Authorize.Net Simple Checkout

**<u>Important information for Subscribers or
Potential Subscribers</u>**

*The Rosengarten Report (c) 2010*

6/3/2011

**An important message from the Website Team...**



---

**Dear Beloved Readers,**

We regret to inform you that the Rosengarten Report will be suspending publication due the departure of David Rosengarten.  As a result we ask for your patience as we begin implementing a transition. This transition includes but is not limited to a total rebranding of the Rosengarten Report and changing the format from a monthly newsletter to an expert driven food journalism website featuring many widely recognized food writers from around the world.  This transition is expected to be completed within the year.  Current subscribers will automatically be given free subscriptions to the new website as well as discounts on special offers from our food & wine merchant partners redeemable at any time.
 Despite David's departure we feel that the new format will keep pace with the current state of the art in food and wine journalism and deliver much more content than was possible before.  While we will miss David's insightful articles we are excited about the new possibilities and are confident about our future.

If you have any questions or concerns about this message email us at support@rosengartenreport.com.

Yours truly,
The Website Team

---

Copyright © The Rosengarten Report, All rights reserved.

1/17/2012



# davidrosengarten.com

| HOME | NEW PRODUCTS | SPECIALS | PRODUCTS | MY ACCOUNT | VIEW CART | LOGIN or REGISTER |

Enter search keywords here    Advanced Search ▸                                                    🛒 empty

**Categories**

▸ Fine Wine->

New Products ...
All Products ...

**New Products - [more]**



2002 Veleta Tempranillo
$34.99

**Producers**

Please Select
Dominio Buenavi...

**Reviews - [more]**

There are currently no
product reviews.

**Search**

Enter search keywords he
Search
Advanced Search

**Bestsellers**

1. 2002 Veleta
Tempranillo

## *2002 VELETA TEMPRANILLO*

Given the David Rosengarten Official "Seal of Approval" after he discovered it on his recent trip to Valencia, Spain. Rated one of Europe's finest.

Now you can discover it too! Just click here...



Copyright © 2012 The Rosengarten Report www.rosengartenreport.com